IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| TIMOTHY MITCHELL, | ) | CASE NO. 1:20-cv-00430 |
| | ) | |
| Plaintiff, | ) | JUDGE DONALD C. NUGENT |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT & RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Timothy Mitchell ("Plaintiff" or "Mitchell") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Supplemental Security Income ("SSI").  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge pursuant to Local Rule 72.2.  For the reasons set forth below, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision.

## I.  Procedural History

On January 31, 2018, Mitchell filed an application for SSI.[1]  Tr. 641, 747, 838-843.  Mitchell alleged an onset date of August 1, 2018, but later amended his alleged onset date to January 31, 2018, the application date.  Tr. 641, 658, 859.  Mitchell alleged disability based on agoraphobia, depression, anxiety, panic attacks, high blood pressure, cholesterol, back pain, and OCD.  Tr. 734, 749, 871.  After initial denial by the state agency (Tr. 766-772) and denial upon reconsideration (Tr. 776-780), Mitchell

---

[1] Mitchell had previously filed applications for social security disability benefits in 2014.  Tr. 711.  Those applications were denied in a decision dated May 1, 2017.  Tr. 641, 708-726.

requested a hearing (Tr. 781-783).  On August 27, 2019, a hearing was held before an Administrative Law Judge ("ALJ").  Tr. 656-682.

On September 10, 2019, the ALJ issued an unfavorable decision (Tr. 638-655), finding that Mitchell had not been under a disability within the meaning of the Social Security Act since January 31, 2018, the date the application was filed (Tr. 642, 650).  In reaching his decision, the ALJ considered the prior May 1, 2017, decision but did not adopt the prior findings because the ALJ found that there was new and material evidence showing a significant change in Mitchell's condition since the amended alleged onset date of January 31, 2018.  Tr. 641.  Mitchell requested review of the ALJ's decision by the Appeals Council. Tr. 835-837.  On January 27, 2020, the Appeals Council denied Mitchell's request for review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-7.

## II. Evidence

### A.    Personal, educational, and vocational evidence

Mitchell was born in 1982.  Tr. 649.  He was 37 years old at the time of the August 27, 2019, administrative hearing.  Tr. 659.  Mitchell attended one year of college but did not receive a degree. *Id.*  Mitchell has always lived at home with his parents.  Tr. 660-661.  Mitchell worked in the past as a salesperson.  Tr. 649, 675.  He last worked in August 2008.  Tr.  871.

### B.    Medical evidence

#### 1.  Treatment history

On May 5, 2017, psychiatric nurse practitioner Sandra Lavelle, PMHNP-BC, authored a letter to Ohio Child and Family Services Food Assistance Program, stating that she had been working with the private practice of Dr. Kimbo, M.D., and had been treating Mitchell for the prior two years for panic disorder with agoraphobia and social phobia disorder.  Tr. 938.

Mitchell continued to receive treatment from Nurse Lavelle throughout 2017.  Tr. 961-968, 969-978, 979-987.  During a June 28, 2017, visit with Nurse Lavelle, Mitchell relayed that he had recently been denied social security benefits again.  Tr. 961.  Mitchell was very disappointed with the result and he questioned the vocational expert's recommendations.  *Id.* Mitchell relayed that he was appealing the decision.  *Id.*  Mitchell had been selling his belongings to help his parents as much as he could.  *Id.*  He reported being very upset and desperate.  *Id.*  Mitchell explained that, when he had to get a state identification card ("ID"), the clerk made him get paperwork from a doctor but, when he presented the paperwork to a DMV office the paperwork was rejected.  *Id.*  Mitchell then went to another DMV office and was able to successfully process his paperwork for a state ID.  *Id.*  Mitchell's diagnoses were social phobia, generalized, and obsessive-compulsive disorder.  *Id.*

During the June 28, 2017, visit, on mental status examination, Nurse Lavelle observed that Mitchell's affect was intense; his mood was anxious and depressed; he presented himself in an appropriate fashion; his eye contact was good; his speech was clear and conversational; his recent and remote memory appeared unimpaired; he had no significant preoccupations in his thought content; he denied hallucinations and none were evident; his attitude was cooperative and interested; he verbalized awareness of his problems and could see consequences; his judgment was good; his attention/concentration was characterized by an ability to attend and maintain focus; and he was reflective and able to resist urges.  Tr. 963.  Nurse Lavelle rated Mitchell's symptoms/impairments, including fear and anxiety of social situations, depressed mood, difficulty being assertive, social interactions, and inability to work, as severe or extreme.  *Id.*  In her "clinical formulation," Nurse Lavelle commented that Mitchell relayed that he had anxiety and panic attacks when he left home; Mitchell had two friends on Facebook but otherwise he only had contact with his parents; he suffered from mild panic attacks, low self-esteem, and erratic sleep; he had a history of bullying as a child; he

was morbidly obese; and he had high cholesterol. *Id.* Mitchell's medications included Xanax, Paxil, Melatonin, Buspar, and Clonazepam. Tr. 967.

During a June 1, 2018, visit with Nurse Lavelle, Mitchell reported there had been "family drama." Tr. 988. Also, he relayed that his application for social security disability benefits had been denied again. *Id.* Mitchell reported having had "a panic attack 'like no other before[,]'" explaining that "he was in an elevator, had tunnel vision, couldn't see his family, [and] didn't respond to people calling his name." *Id.* Mitchell's diagnoses of social phobia, generalized, and obsessive-compulsive disorder remained. *Id.* Nurse Lavelle's mental status findings (Tr. 991) were similar to prior findings (Tr. 963). Nurse Lavelle continued Mitchell's medications of Xanax, Paxil, Melatonin, Buspar, and Clonazepam, increasing the dosages for Xanax and Buspar. Tr. 995.

When Mitchell saw Nurse Lavelle on December 5, 2018, Mitchell reported that leaving his house caused him stress and he struggled to be around people. Tr. 1032. Other reported stressors included being unemployed and having no income. Tr. 1033. Mitchell also reported family conflict but indicated he had a good relationship with his parents. Tr. 1033, 1035. Mitchell's "[p]resenting problems include[d] depression, indecisiveness regarding career, low energy, panic attacks, poor self-esteem, sleep disturbance, and social anxiety." Tr. 1033. Nurse Lavelle noted no change in Mitchell's condition. Tr. 1033. Mitchell had an upcoming social security disability hearing. *Id.* Nurse Lavelle noted that Mitchell reported not leaving his house for six months but she observed that he did not appear overly anxious about being at the appointment that day. *Id.* Mitchell reported that, when he left his house, he felt "as if a safe [was] going to fall on him from above." *Id.* Mitchell's diagnoses of social phobia, generalized, and obsessive-compulsive disorder remained. Tr. 1039. Mitchell's medications remained unchanged. Tr. 1044.

When Mitchell saw Nurse Lavelle on June 5, 2019, he relayed that he was about the same.  Tr. 1048.  Mitchell indicated that his disability hearing was scheduled for August.  *Id.*  He was worried because he had waited so long.  *Id.*  Mitchell had been arguing with his parents a lot.  *Id.*  Mitchell relayed that he had a panic attack at his last hearing and, he was afraid it was going to happen again and hurt his chance of getting disability.  *Id.*  He reported poor sleep and nightmares.  *Id.*  Mitchell's diagnoses were social phobia, generalized, obsessive-compulsive disorder, and panic disorder without agoraphobia.  *Id.*  Mental examination findings were generally the same, except Mitchell's thought content was characterized as being concerned about being in public for his disability hearing.  Tr. 1051.  Nurse Lavelle continued to rate Mitchell's symptoms/impairments, including fear and anxiety of social situations, depressed mood, difficulty being assertive, social interactions, and inability to work, as severe or extreme.  Tr. 1051.  Mitchell's medications remained unchanged.  Tr. 1056.

### 2.  Opinion evidence

#### a.  Treating medical provider

In her May 5, 2017, letter to the Ohio Child and Family Services Food Assistance Program, Nurse Lavelle stated she had been treating Mitchell for the prior two years for panic disorder with agoraphobia and social phobia disorder.  Tr. 938.  Nurse Lavelle stated that Mitchell was experiencing the following symptoms: panic attacks, anxiety and worry, somatic symptoms, derealization, avoidance, and isolation.  *Id.*  Nurse Lavelle expressed her opinion that Mitchell was unable to work at the time and he had applied for disability.  *Id.*  She further opined "It is most probable that these conditions may be lifelong."  *Id.*

On June 5, 2019, Nurse Lavelle completed a Medical Source Statement – Mental Capacity wherein she rated Mitchell's functional mental abilities.  Tr. 1057-1058.  She indicated that she had been treating Mitchell for five years.  Tr. 1058.  The diagnoses supporting her assessment were social

phobia, panic disorder, and obsessive-compulsive disorder.  Tr. 1058.  The rating options were "no limitation (or none)," "mild limitation," "moderate limitation," "marked limitation," and "extreme limitation."  Tr. 1057.

Nurse Lavelle opined that Mitchell had moderate limitations in the following areas – understand and learn terms, instructions or procedures; follow one or two step oral instructions to carry out a task; describe work activity to someone else; ask and answer questions and provide explanations; recognize a mistake and correct it; cooperate with others; state own point of view; initiate or sustain conversation; and initiate and perform a task that he understands and knows how to do.  Tr. 1057-158.

Nurse Lavelle opined that Mitchell had marked limitations in the following areas – identify and solve problems; sequence multi-step activities; use reason and judgment to make work related decisions; ask for help when needed; handle conflicts with others; understand and respond to social cues (physical, verbal, emotional); respond to requests, suggestions, criticism, correction and challenges; keep social interactions free of excessive irritability, sensitivity, argumentativeness, or suspiciousness; work at an appropriate and consistent pace; complete tasks in a timely manner; ignore or avoid distractions while working; change activities or work setting without being disruptive; work close to or with others without interrupting or distracting them; respond to demands; manage one's psychologically based symptoms; distinguish between acceptable and unacceptable work performance; set realistic goals; making plans for oneself independent of others; maintain personal hygiene and attire appropriate to a work setting; and be aware of normal hazards and take appropriate precautions. Tr. 1057-1058.

Nurse Lavelle opined that Mitchell had extreme limitations in the following areas – sustain an ordinary routine and regular attendance at work; work a full day without needing more than the allotted number or length of rest periods during the day; and adapt to changes.  Tr. 1058.

On July 3, 2019, Nurse Lavelle sent a letter to Mitchell's legal counsel stating she had been treating Mitchell for five years for panic disorder with agoraphobia and social phobia disorder and he was experiencing the following symptoms: panic attacks, anxiety and worry, somatic symptoms, derealization, avoidance, and isolation.  Tr. 1062.  She further explained that, "[a]lthough he has these symptoms, Mr. Mitchell is stable and his condition has not worsened in the past year."  *Id.*  She also indicated that at Mitchell's most recent counseling session on December 5, 2018, Mitchell reported that leaving his house was very difficult for him.  *Id.*

### b.  Consultative examination

On June 28, 2018, Dr. Dariush Saghafi, M.D., completed a consultative internal medicine examination.  Tr. 1013-1020.  As part of his examination, on mental status examination, Dr. Saghafi noted that in addition to physical impairments, Mitchell's medical history included anxiety, depression, panic attacks and insomnia.  Tr. 1014.  Also, as part of his examination, Dr. Saghafi observed that Mitchell was alert and oriented to person, place, and time and Mitchell followed commands.  Tr. 1015.  As part of his impression. Dr. Saghafi opined that Mitchell was "able to understand the environment as well as peers and communicate satisfactorily . . . [and] travel independently."  Tr. 1016.

### c.  State agency medical consultants

On initial review, on July 13, 2018, Courtney Zeune, Psy.D., state agency reviewing medical consultant psychologist, completed a Psychiatric Review Technique ("PRT") (Tr. 740-741) and Mental RFC Assessment (Tr. 744).  In the PRT, Dr. Zeune found that Mitchell had no limitations in

his ability to understand, remember, or apply information or in his ability to adapt or manage oneself; mild limitations in his ability to concentrate, persist, or maintain pace; and moderate limitations to interact with others.  Tr. 740.  In the Mental RFC, Dr. Zeune adopted the Mental RFC findings from the ALJ decision dated May 1, 2017, (Tr. 744), which included the following limitations – "He can perform tasks in a non-public setting with few co-workers.  He can work in an environment that does not demand interaction with general public and that contact is limited to superficial contact with co-workers and supervisors[]" (Tr. 715).

Upon reconsideration, on September 7, 2018, Robyn Murry-Hoffman, Ph.D., state agency reviewing psychologist, completed a PRT (Tr. 753-754) and Mental RFC Assessment (Tr. 757-758), wherein she affirmed Dr. Zeune's findings.

## C.    Hearing testimony

### 1.    Plaintiff's testimony

Mitchell testified and was represented at the hearing.  Tr. 658, 659-674, 675, 680-681. Mitchell explained that his primary impairment was anxiety but he also had lower back pain.  Tr. 659. Mitchell had both impairments at the last hearing.  Tr. 659.  Mitchell indicated that his symptoms were "[a] little bit worse" since the last hearing.  Tr. 660.  When the ALJ asked Mitchell how his symptoms were worse, Mitchell stated "Its hard to speak.  I'm sorry.  I'm -- I'm just really shaky right now . . . I can't catch my breath.  I'm having a hard time breathing, I'm sorry . . . It's -- I can't even talk.  I just can't put my thoughts together, sir, I'm sorry."  *Id.* The ALJ encouraged Mitchell to take his time and indicated that they would get through it.  *Id*.

The ALJ proceeded to ask Mitchell to describe what an average day was like for him.  Tr. 660. Mitchell explained that, on a good day, he will get up and go downstairs to talk with his parents.  *Id.* On a bad day, he will stay in bed.  *Id.*  On bad days, if he forces himself to get up, he gets hostile with

his family.  *Id.*  If it is a good day, Mitchell will watch the news in the morning and maybe have a piece of toast for breakfast.  Tr. 661.  Mitchell usually naps during the day for a couple of hours because he is groggy after taking all of his medicine.  Tr. 661, 673.  He will then eat dinner and talk with his parents for an hour or so and then go back to his room for the evening.  *Id.*  On average, Mitchell estimated having five bad days each week.  Tr. 670.

Mitchell has never lived alone and indicated he would not be able to move out.  Tr. 661.  He explained that there really was not anything that brought him enjoyment.  *Id.*  All he really does is watch television and worry.  *Id.*  Mitchell can follow the plot of a television show.  Tr. 672.  He spends time online on a computer about an hour per day.  Tr. 671.  He uses Facebook but not very often.  Tr. 671-672.  When the ALJ asked Mitchell what he was worrying about, Mitchell explained that at that time he was worrying about having to move out of their house because his family was being evicted.  Tr. 661-662.  When Mitchell worries, he says there are times that he cannot stop worrying at night and he cannot sleep even with medicine.  Tr. 662.

Mitchell indicated he was about 5'9" tall and weighed around 330 pounds.  Tr. 662.  His weight was down about 30 pounds since the prior year or so.  *Id.*  The weight loss was not associated with an exercise program.  *Id*.  Mitchell indicated he just had not had much of an appetite.  *Id.*

Mitchell's father drove him to the hearing.  Tr. 662.  Attending the hearing was difficult for Mitchell.  Tr. 662.  Mitchell explained that, while driving to the hearing, he had a panic attack, which causes him to be real jittery; he gets tunnel vision; his heart races; and he cannot be around people.  Tr. 663.  Mitchell also had a panic attack when he walked into the hearing room.  Tr. 666.  His head would not stop shaking and he could not breathe.  *Id.*  Mitchell said that anything could trigger a panic attack.  Tr. 664.  Mitchell has one or more panic attacks each day.  Tr. 666.  A panic attack lasts from a few minutes to half an hour.  Tr. 666-667.  When he has a panic attack, the only thing he can do is

think of breathing – it is sort of like a black out.  Tr. 667.  Mitchell indicated that, for years, he had not left his house for anything other than doctor appointments or attending disability hearings.  Tr. 671.

Mitchell has obsessive-compulsive disorder.  Tr. 667-668.  For example, at times, he has "to touch each thumbnail to each finger rapidly back and forth until [he] feel[s] like [he] [does not] have to do it anymore like that."  Tr. 668.  He checks door locks five to ten times in a row.  Tr. 668.  He turns the gas off on the stove every evening because he is afraid there will be a gas leak.  Tr. 668-669.

Mitchell indicated he had been seeing Sandra Lavelle for about four or five years.  Tr. 663.  His sessions occur anywhere between every one to three months.  Tr. 674.  Mitchell takes Xanax for his panic attacks.  Tr. 663.  The medicine helps but it makes him tired and he has to lie down when he takes it.  *Id.*  Mitchell also takes other medication, including Klonopin and Buspar.  Tr. 665.  His medical providers increased his Xanax dose about a year before the hearing and his Klonopin and Buspar were also increased.  *Id.*  Mitchell has never been hospitalized for a psychiatric condition.  *Id.*  He has missed one or two appointments with Nurse Lavelle because of anxiety.  *Id.*  The last time he had to reschedule was the previous winter or fall.  Tr. 665-666.  Mitchell feels that his medication has helped make him feel a little better but he is "not cured[.]"  Tr. 673.

When the ALJ asked Mitchell where he saw himself in five years, Mitchell indicated he did not know.  Tr. 663-664.  And, when the ALJ asked Mitchell what he would do if something happened to his parents, Mitchell said he did not know and he did not have anyone else.  Tr. 664.  When Mitchell was asked whether he would be able to leave his house to get to a job if he was offered one, Mitchell indicated he would not be able to because he would have to be around people.  Tr. 673-674.  His depression eventually turns into anger and he snaps back and forth with his parents and that makes his depression worse.  Tr. 674.

### 2.      Vocational expert's testimony

A Vocational Expert ("VE") testified at the hearing.  Tr.  675-680.  The VE described

Mitchell's past work as salesperson, general hardware, with a physical demand level of light,

performed by Mitchell at the medium level.  Tr. 675.

The ALJ asked the VE to consider a male person of the same age, education, and work

background as Mitchell who can lift and carry 20 pounds occasionally and 10 pounds frequently; can

walk six out of eight hours; can stand six out of eight hours; can sit six out of eight hours; can

occasionally use a ramp or stairs; can never climb a ladder, rope or scaffold; can constantly balance;

can occasionally stoop, kneel, crouch and crawl; must avoid entirely dangerous machinery and

unprotected heights; can perform no complex tasks but can perform simple, routine tasks that are low

stress, meaning no high production quotas or piece rate work; can have superficial and occasional

contact with co-workers, with superficial meaning no arbitration, confrontation, negotiation,

supervision or commercial driving; and can have no contact with the public.  Tr. 676.  The VE

indicated that the described individual would not be able to return to his past work but the individual

would be able to perform the following light, SVP 2 (unskilled)[2] jobs – mail clerk, routing clerk, and

delivery marker.  Tr. 676-676.  The VE provided job incidence data for the identified jobs.  *Id.*

If the individual described in the first hypothetical was off task 30 minutes each day, with the

30 minutes spread throughout the day, the VE indicated that the jobs identified would remain.  Tr. 677,

680.  The VE clarified that being off-task up to 15% of the time would be tolerated.  Tr. 680.

However, if, on a daily basis, the individual needed a 30-minute break at one time in addition to the

---

[2] SVP refers to the DOT's listing of a specific vocational preparation (SVP) time for each described occupation. Social Security Ruling No. 00-4p, 2000 WL 1898704, *3 (Dec. 4, 2000).   "Using the skill level definitions in 20 CFR 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT."  *Id.*

normal breaks, that would be work preclusive. Tr. 678, 680. The VE was unable to identify simple, routine, repetitive positions where the individual would not have to leave his home. Tr. 679. If the first hypothetical was modified to limit the individual to occasional and superficial contact with not only co-workers but also with supervisors, the VE indicated that her answer would not change, i..e, the jobs previously identified would remain available. Tr. 679.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1.    If the claimant is doing substantial gainful activity, he is not disabled.

2.    If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.    If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.    If the impairment does not meet or equal a listed impairment, the ALJ must assess

the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 416.920;  *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform work available in the national economy.  *Id.*

### IV. The ALJ's Decision

In his September 10, 2019, decision, the ALJ made the following findings:[3]

1. Mitchell has not engaged in substantial gainful activity since January 31, 2018, the application date. Tr. 643.

2. Mitchell has the following severe impairments: morbid obesity, degenerative disc disease of the spine, and anxiety disorder.  Tr. 643.

3. Mitchell does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments.  Tr. 644-645.

4. Mitchell has the RFC to perform light work as defined in 20 C.F.R. § 416.967(b) with the following additional limitations: occasional climbing of ramps and stairs; no climbing of ladders, ropes, or scaffolds; occasional stooping, kneeling, crouching, or crawling; must avoid unprotected heights and dangerous machinery; limited to simple, routine tasks, no complex tasks; limited to low stress work meaning no high production quotas or piece rate work; limited to superficial and occasional interaction with coworkers, meaning no arbitration, confrontation, negotiation, or supervision; no commercial driving; and no interaction with the public. Tr. 645-648.

5. Mitchell is unable to perform any past relevant work. Tr. 648-649.

---

[3] The ALJ's findings are summarized.

6.    Mitchell was born in 1982 and was 35 years old, defined as a younger individual age 18-49, on the date the application was filed.  Tr. 649.

7.    Mitchell has at least a limited education and is able to communicate in English. Tr. 649.

8.    Transferability of job skills is not material to the determination of disability.  Tr. 649.

9.    Considering Mitchell's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Mitchell can perform, including mail clerk, routing clerk, and delivery marker.  Tr. 649-650.

Based on the foregoing, the ALJ determined that Mitchell had not been under a disability, as defined in the Social Security Act, since January 31, 2018, the date the application was filed.  Tr. 650.

## V. Plaintiff's Arguments

Mitchell argues that the ALJ erred by rejecting the findings contained in Nurse Lavelle's medical opinions and erred by failing to identify the weight assigned to her opinions.  Doc. 11, pp. 9-14.  Mitchell also argues that the ALJ improperly interpreted raw medical data when assessing his RFC.  Doc. 11, pp. 15-16.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).

**A.      The undersigned recommends that the Court find no error with respect to the ALJ's consideration and weighing of the opinions rendered by Nurse Lavelle**

Mitchell claims that the ALJ erred with respect to the opinions rendered by Nurse Lavelle. He contends that the ALJ erred by rejecting the limitations contained in Nurse Lavelle's opinions and erred by not assigning specific weight to her opinions

Since Mitchell's claim was filed after March 27, 2017, the Social Security Administration's ("SSA") new regulations for evaluation of medical opinion evidence apply to his claim. *See Revisions to Rules Regarding the Evaluation of Medical Evidence* (*Revisions to Rules*), 2017 WL 168819, 82 Fed. Reg. 5844 (Jan. 18, 2017); 20 C.F.R. § 416.920c.

The new regulations set forth the various categories of evidence, which include (1) objective medical evidence; (2) medical opinions; (3) other medical evidence; (4) evidence from non-medical sources; and (5) prior administrative medical findings. 20 C.F.R. § 416.913(a)(1)-(5). As the regulations explain, "A prior administrative medical finding is a finding, other than the ultimate determination about whether you are disabled, about a medical issue made by our Federal and State agency medical and psychological consultants at a prior level of review . . . in [claimant's] current

claim based on their review of the evidence in [the claimant's] case record[.]"  20 C.F.R. § 416.913(a)(5).

Under the new regulations applicable to claims filed on or after March 27, 2017, a licensed advanced practice registered nurse, or other licensed advanced practice nurse with another title, is included in the definition of "acceptable medical source."  20 C.F.R. § 416.902.  However, the new regulations also provide that the SSA "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources."  20 C.F.R. § 416.920c(a).  Rather than the prior framework for evaluation of medical opinions that involved more weight generally being given to opinions from treating sources, i.e., the "treating physician rule," the new regulations provide that "administrative law judges will now evaluate the 'persuasiveness' of medical opinions by utilizing the five factors listed in paragraphs (c)(1) through (c)(5) of the regulation."  *Jones v. Comm'r of Soc. Sec.*, 2020 WL 1703735, at *2 (N.D. Ohio Apr. 8, 2020) (quoting *Gower v. Saul*, 2020 WL 1151069, at * 4 (W.D. Ky, March 9, 2020) (citing 20 C.F.R. § 404.1520c(a) and (b)); *see also Ryan L. F. v. Comm'r of Soc. Sec.*, 2019 WL 6468560, at *4 (D. Or. Dec. 2, 2019) ("Although the regulations eliminate the 'physician hierarchy,' deference to specific medical opinions, and assigning 'weight' to a medical opinion, the ALJ must still 'articulate how [he/she] considered the medical opinions' and 'how persuasive [he/she] find[s] all of the medical opinions.'") (citing 20 C.F.R. §§ 404.1520c(a) and (b) (1), 416.920c(a) and (b) (1)) (alterations in original)).

Further, under the new regulations, administrative law judges "will articulate how [they] considered the medical opinions or prior administrative medical findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate."  20 C.F.R. § 416.920c(b)(1).  They "are not required to articulate how [they]

considered each medical opinion or prior administrative medical finding from one medical source individually." *Id.*

The five factors are supportability, consistency, relationship with the claimant, specialization, and other factors, with supportability and consistency being the most important factors that are considered.  20 C.F.R. § 416.920c(c)(1)-(5); 20 C.F.R. § 416.920c(b)(2).  Therefore, administrative law judges "will explain how [they] considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in [their] determination or decision."  20 C.F.R. § 416.920c(b)(2).  The regulations explain the "supportability" factor as follows: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be."  20 C.F.R. § 416.920c(c)(1).  And, the "consistency" factor is explained as follows: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be."  20 C.F.R. § 416.920c(c)(2).

The regulations provide that administrative law judges "may, but are not required to, explain how [they] considered the factors in paragraphs(c)(3) through (c)(5) of this section, as appropriate, when [they] articulate how [they] consider medical opinions and prior administrative medical findings in [a claimant's] case record."[4]  20 C.F.R. § 416.920c(b)(2).  "Additionally, administrative law judges 'must consider' medical findings of non-examining state agency medical or psychological consultants

---

[4] However, where administrative law judges find that there are equally persuasive medical opinions or prior administrative medical findings about the same issue but where they are not exactly the same, administrative law judges "will articulate how [they] considered the other most persuasive factors in paragraphs (c)(3) through (c)(5) of this section for those medical opinions or prior administrative medical findings in [a claimant's] determination or decision."  20 C.F.R. § 416.920c(b)(3).

according to the new regulation." *Gower*, 2020 WL 1151069, at *4 (citing 20 C.F.R. §

404.1513a(b)(1), which provides that, "Administrative law judges are not required to adopt any prior

administrative medical findings, but they must consider this evidence according to §§ 404.1520b,

404.1520c, and 404.1527, as appropriate, because our Federal or State agency medical or

psychological consultants are highly qualified and experts in Social Security disability evaluation.").

Here, consistent with the regulations, the ALJ considered the persuasiveness of Nurse

Lavelle's opinions.  Tr. 647.  More particularly, the ALJ explained:

> I have considered the medical opinions of record in rendering this decision.  In a letter
> dated May 5, 2017, Sandra Lavelle, PMHNP-BC, concluded that the claimant is unable
> to work (Exhibit B1F).  Ms. Lavelle also completed a questionnaire on June 5, 2019
> (Exhibit B8F).  She concluded that the claimant experiences moderate to marked
> limitations in his ability to understand, remember, or apply information and interact with
> others.  He primarily experienced marked to extreme limitations in his ability to
> concentrate, persist, or maintain pace and adapt or manage himself.
>
> In determining the extent to which the opinions of Ms. Lavelle are persuasive, I note that
> she treated the claimant for panic disorder with agoraphobia and social phobia disorder.
> She also noted that the claimant was experiencing panic attacks, anxiety and worry,
> somatic symptoms, derealization, avoidance, and isolation (see Exhibit B10F).  However,
> her conclusions are not consistent with objective findings throughout her treatment
> records. For example, treatment records from Ms. Lavelle generally note that the
> claimant's mood was anxious and affect intense; however, memory was intact, eye
> contact was good, psychomotor activity normal, speech clear, thought content normal,
> attention and concentration intact, and he was cooperative with good judgment and
> insight (Exhibits B3F:4, 12, 47, B6F:18, and B7F:4).  It appears that the extreme
> limitations are based primarily on the claimant's subjective reports.  As outlined above,
> the weight of the objective and subjective evidence of record documents moderate
> limitations in the ability to understand, remember, or apply information, marked
> limitations in the ability to interact with others, moderate limitations in the ability to
> concentrate, persist, or maintain pace, and moderate limitations in the ability to adapt or
> manage himself.

Tr. 647 (emphasis supplied).

Mitchell takes issue with the ALJ not assigning a specific weight to Nurse Lavelle's opinions,

arguing that ALJs must "identify the amount of evidentiary weight that is assigned to the medical

opinions of the claimant's treating sources[]" and "[a]n ALJ's failure to adequately explain the weight

given to treating sources' opinions is not harmless."  Doc. 11, p. 14 (citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409 (6th Cir. 2009).  Mitchell's argument is based, however, on case law pertaining to the treating physician rule that no longer applies under the new regulations.  Furthermore, under the new regulations, although Nurse Lavelle may now be considered an acceptable medical source, her opinions are not entitled to any specific evidentiary weight.  20 C.F.R. § 416.920c(a). And, in accordance with the regulations, when considering the persuasiveness of Nurse Lavelle's opinions, the ALJ considered the consistency and supportability of those opinions.  Tr. 647.  For example, the ALJ explained that Nurse Lavelle's conclusions were not consistent with objective findings throughout her treatment records and the extreme limitations contained in her opinions appeared to be based primarily on Mitchell's subjective complaints.  Tr. 647.  Considering the foregoing, the undersigned finds that Mitchell's claim that reversal and remand is warranted because the ALJ did not specifically assign weight to Nurse Lavelle's opinions is without merit.

Mitchell also argues that the ALJ erred by rejecting the limitations contained in Nurse Lavelle's opinions.  Doc. 11, pp. 9-14.  In making this argument, Mitchell argues that, contrary to the ALJ's finding, Nurse Lavelle's opinions are consistent with and supported by the medical evidence and, therefore, the ALJ's failure to incorporate the limitations contained therein into the RFC constitutes reversible error.  Doc. 13, p. 9.  He also argues that the decision does not provide "good reasons" for not finding Mitchell as limited as Nurse Lavelle opined.  Doc. 11, p. 12.  Here, as discussed above, the ALJ considered Nurse's Lavelle's opinions and explained the extent to which he found them persuasive.  Tr. 647.  In reaching his decision, the ALJ did not ignore evidence and a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner*, 745 F.2d at 387.  Thus, any attempt by Mitchell to argue that this Court should weigh the evidence and find that the opinions are consistent with and supported by the evidence is not warranted.

Additionally, Mitchell's "good reasons" argument is premised on the treating physician rule that is no longer applicable to claims like Mitchell's that are filed on or after March 27, 2017.

Moreover, the ALJ did not disregard Mitchell's mental impairments or fail to account for them in the RFC. The ALJ included the following mental limitations in the RFC – "limited to simple, routine tasks, no complex tasks, is limited to low stress work meaning no high production quotas or piece rate work, is limited to superficial and occasional interaction with coworkers, meaning no arbitration, confrontation, negotiation, or supervision, and no commercial driving, and no interaction with the public." Tr. 645. And Mitchell has not shown that, in order for the ALJ's RFC to be found to be supported by substantial evidence, the ALJ was required to adopt Nurse Lavelle's medical opinions.

For the reasons explained herein, the undersigned recommends that the Court find no error with respect to the ALJ's consideration and weighing of the opinions rendered by Nurse Lavelle.

**B.     The undersigned recommends that the Court find that the ALJ did not improperly interpret raw medical data when formulating Mitchell's RFC**

Mitchell argues that remand is required in order for a consultative examination. Doc. 11, pp. 15-16. He contends that, because the ALJ rejected the opinions of the state agency consultants and found Nurse Lavelle's opinions inconsistent with the medical evidence, it is unclear what medical opinion the ALJ relied upon when rendering his decision and the ALJ, therefore, improperly interpreted raw medical data when assessing Mitchell's RFC. Doc. 11, pp. 15-16. The undersigned finds Mitchell's argument to be without merit.

An ALJ, not a physician, is responsible for assessing a claimant's RFC. *See* 20 C.F.R. § 404.1546 (c); *Poe v. Comm'r of Soc. Sec.*, 342 Fed. Appx. 149, 157 (6th Cir.2009). When assessing a claimant's RFC, an ALJ "is not required to recite the medical opinion of a physician verbatim in his residual functional capacity finding . . . [and] an ALJ does not improperly assume

the role of a medical expert by assessing the medical and nonmedical evidence before rendering a residual functional capacity finding." *Id.*

The ALJ did not reject in their entirety the opinions of the state agency consultants, which were an adoption of the prior ALJ's RFC.  Tr. 648.  Rather, the ALJ found the opinions "somewhat persuasive, as they are consistent with the objective evidence of record."  Tr. 648. The ALJ also found that there was new and material evidence showing changes in Mitchell's condition since the prior decision and, therefore, included additional limitations in the Mental RFC, i.e., the ALJ  limited Mitchell to "simple, routine tasks, no complex tasks, and . . . low stress work meaning no high production quotas or piece rate work."  Tr. 648.  Thus, with the ALJ finding the opinions somewhat persuasive and consistent with objective evidence, it cannot be said that the ALJ did not rely on medical opinion evidence when formulating the RFC. Furthermore, the Sixth Circuit has "rejected the argument that a residual functional capacity determination cannot be supported by substantial evidence unless a physician offers an opinion consistent with that of the ALJ."  *Mokbel-Alijahmi v. Comm'r of Soc. Sec.*, 732 Fed. Appx. 395, 401 (6th Cir. 2018).

Although the ALJ did not find the opinions of Nurse Lavelle's opinions or the state agency consultants' opinions entirely persuasive, Mitchell has not shown that the RFC is unsupported by substantial evidence.  Nor has he shown that the ALJ simply interpreted raw medical data when assessing Mitchell's RFC.  The ALJ took into account the evidence pertaining to Mitchell's mental impairments, including the medical opinion evidence, and assessed his RFC in accordance with the regulations.  Considering the foregoing, the undersigned recommends that the Court find reversal and remand is not warranted for further assessment of Mitchell's RFC and/or consultative examination.

## VII. Recommendation

For the foregoing reasons, the undersigned recommends that the Court **AFFIRM** the

Commissioner's decision.


January 15, 2021                    */s/ Kathleen B. Burke* _____
                                    Kathleen B. Burke
                                    United States Magistrate Judge


## **OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of
Courts within fourteen (14) days after the party objecting has been served with a copy of this
Report and Recommendation.  Failure to file objections within the specified time may waive the
right to appeal the District Court's order.  See *United States v. Walters*, 638 F.2d 947 (6th Cir.
1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).